## FINLEY PORTER v. STATE.

No. A-10113.   Jan. 27, 1943.
(133 P. 2d 903.)

W. N. Redwine and W. J. Hulsey, both of McAlester, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., and Sam H. Lattimore, Asst. Atty. Gen., for defendant in error.

JONES, P. J.   The defendant, Finley Porter, was charged by information filed in the district court of Pittsburg county with the crime of murder, was tried, convicted and sentenced to death.

Counsel for defendant who appealed this case appeared as counsel when defendant was first arraigned. Later they sought to withdraw as attorneys for the defendant because of his inability to pay them a fee.   When this matter was called to the attention of the trial court a proper order was made appointing these attorneys as counsel for defendant and directing them to continue their services.   The record discloses that they performed their services diligently and well.   An earnest effort was made to acquit the defendant before the jury and an able brief has been filed in this court in support of the various assignments of error.

The evidence of the state, briefly stated, is as follows:

Finley Porter, the defendant, a negro, age 38, was committed to the penitentiary in 1934 to serve a life sentence for murder.

L. Z. Beecham, the deceased, also a negro, age 21, was committed to the penitentiary to serve two years for burglary.

The two negroes had been cellmates for three or four weeks prior to Beecham's death on April 28, 1941.   The evidence upon which the conviction is based was furnished mainly by inmates of the penitentiary and guards who were on duty at the time of the homicide.   Some of the

inmates testified to hearing the defendant express a desire to commit the act of sodomy with the deceased and threaten the deceased in case of his refusal to submit.

Lloyd Allen testified that he and the deceased were talking in the prison yard on Sunday morning before the deceased was killed that night. That the defendant came to where they were talking and said to the deceased: "Well, are you going to do as I asked you?" and the deceased said, "I'll give you an answer after while." That the witness suggested to the deceased that he move out of the cell which he was occupying with defendant and deceased stated that defendant had threatened to kill him if he moved. That the defendant told the witness at that time that if the witness, Lloyd Allen, didn't stay out of defendant's business he would kill him. That he understood from what was said between Porter and Beecham that Porter was wanting to commit sodomy with Beecham.

Bishop Kilgore testified that he was bell-hop captain. That in April he placed Zeke Beecham to work as a bell-hop on one Friday afternoon. That on Saturday the defendant approached the witness in the prison yard and said he did not want Beecham to be working as a bell-hop, as that was his boy.

Porter Carmichael testified that he saw defendant and deceased on the date that deceased was killed. That the first time he saw them was on No. 2 run. That while he was in a lavatory he heard the defendant threatening the deceased, and in the conversation he heard defendant tell the deceased that he was going to "f— him that night or kill him." That Beecham said "Well, I will see you when I come back," and went on to church. That he and Porter went on to the prison church and Porter's whole conversation during church was about using the man as

his woman. That when the first conversation between defendant and deceased occurred the witness stepped into a lavatory and listened to the proposals being made to the deceased by defendant.

The cell guards and attendants testified that about midnight they heard the defendant yelling: "Cell man, cell man, come and get me, this man is killing me." That they ran to the cell which defendant and deceased were occupying and defendant had the deceased down on the floor and was cutting on him with a knife. That when they first arrived on the scene the deceased appeared lifeless, but the defendant was on him and still cutting him with a knife and yelling for the cell guards. The defendant was fully dressed, but the deceased had nothing on but an undershirt.

The men who first arrived at the cell testified that the defendant continued to cut on the deceased after they arrived, even though the deceased appeared at that time to be in a lifeless condition. That the defendant did not quit cutting on deceased until one of the attendants threw a flashlight through the bars and struck defendant, which caused him to desist.

The deceased's body was terribly cut. The throat had been cut several times and the head almost severed from the body. His back was cut deeply in many places, one of them penetrating the heart.

When the guards arrived at the cell the defendant directed their attention to a place just under his shoulder blade where he complained that the deceased had struck him. The guards removed half of a scissors which was still sticking in defendant's clothes and which had just penetrated the skin. The doctors who examined the deceased and defendant testified that the cut on the de-

fendant did not penetrate to the muscle but was only superficial.

The only evidence introduced on behalf of defendant was the testimony of defendant himself. He testified that he had gone to sleep in the lower bunk. That the first he knew anything was wrong was when deceased woke him by stabbing him. That he grabbed a knife from under his pillow and commenced to stab deceased and continued to stab him until he was stopped by the guards. On cross-examination he admitted paying an inmate a dollar to get deceased transferred to his cell. He denied having any of the conversations related by the state's witnesses and denied ever wanting to commit sodomy with deceased. That he had never had a cross word with deceased.

It is first contended that the court erred in over-ruling the motion for continuance. No written motion was ever presented, but on the Saturday before the trial of the defendant was set for Monday counsel for defendant asked the court to continue the case for the reason that he had not had time to prepare for trial. At that time counsel for defendant stated:

"* * * I have made an endeavor, under the short notice I have had, but have been unable, and as stated to you, I do not see how I can represent this man and give him proper representation under the short notice I have had, and for that reason I would like to have this case continued until the next term of court or such time as the court would like to hear it.

"I do not believe that I can do him justice if I should have to go to trial now. I realize it is difficult to appoint another attorney now, but it is difficult to get ready for trial in a murder case, and especially, when one is in the penitentiary. If an attorney could consult with him and he could come to the office and consult with me, it would not be so difficult, but where he is in the

penitentiary and you cannot confer with him, it takes more time, and I will ask now and make this motion now that the case be continued until the next term of court."

In response to the application for continuance the county attorney dictated a long statement into the record which is unnecessary to repeat.

Defendant was arraigned on May 27, 1941. At that time a copy of the information with the names of all the witnesses with their post-office addresses shown thereon was served on defendant and his counsel. At that time the trial was fixed for June 9th. All of these witnesses were inmates of the penitentiary at McAlester or employees of that institution and easily accessible to counsel, who lived in McAlester. A preliminary examination had been held three weeks prior to the arraignment in district court and the evidence of the state was introduced at that hearing. It is evident from a review of the entire record that counsel were as ready at the time of trial as they would have ever been. There simply were no witnesses nor any other evidence available to support the fantastic story related by the defendant. There was no abuse of discretion in refusing the application for a continuance. Jewell v. State, 41 Okla. Cr. 389, 273 P. 366.

It is next contended that the court erred in overruling defendant's motion to quash the jury panel. The motion to quash the jury panel and the proceedings at the hearing on said motion show that the defendant based his motion entirely upon his claim that for many years there had been a systematic exclusion of negroes from jury service. At the time the motion was presented considerable colloquy between counsel and the court appears in the record, and it is evident that counsel for defendant do not contend that discrimination was practiced in

the selection of the present jury, but sought to introduce proof showing that over a long period of years no negroes had been selected for jury service. The motion alleges that Pittsburg county has now and has had for a long number of years a large negro population, among whom are about 2,000 negroes who are competent and qualified to serve on petit juries, but that no negroes have been permitted to sit on petit juries since statehood by reason of a systematic effort to prevent them from so doing.

It affirmatively appears from the record that there were two negroes among the list of 24 jurors which composed the present jury panel. There were no allegations in the motion to quash the panel nor offer of proof to show a discrimination in the selection of the jurors whose names had been selected at large from the citizenship of the county to serve for that year. Since it is admitted that two negroes were among the 24 who had been drawn for jury service for that term of court and there is no allegation as to the number of negroes nor offer to prove the number of negroes whose names were in the list of qualified jurors selected by the jury commissioners to serve for that current year, the court did not err in overruling the motion to quash and refusing to hear proof on the offer to show that there had been a systematic exclusion of negroes from jury lists in the past.

Counsel for defendant cite the cases of Smith v. State of Texas, 311 U. S. 128, 61 S. Ct. 164, 85 L. Ed. 84; and Norris v. State of Alabama, 294 U. S. 587, 55 S. Ct. 579, 79 L.Ed. 1074. While these two cases are authority for the proposition that evidence of a systematic exclusion of negroes from jury lists in previous years is pertinent and admissible in evidence, yet they are not authority for the proposition contended for by the defend-

24

ant because the admission of such evidence to show a systematic exclusion in the past only becomes pertinent when it is shown that negroes were omitted from the present jury panel and it is contended that such omission was intentional because of their race. It is immaterial whether there has been discrimination in the past unless it is alleged that such discrimination had been practiced with reference to the current jury list.

If the contention of counsel should be sustained, then no negro could ever be tried in Pittsburg county, because years ago, prior to certain decisions of the United States Supreme Court criticizing such practice, there possibly had been in that county, as well as in many other counties of the south, a systematic exclusion of negroes from jury panels. But it is manifest that in Pittsburg county that situation had been remedied and the jury commissioners were selecting jurors fairly and impartially without regard to their race. At least, there were two negroes on the present panel and no contention is presented that there had been unfair discrimination in the selection of said panel. The evidence sought to be introduced by defendant could only have been admissible as tending to show a scheme to prevent negroes from performing jury service where it is shown that they were omitted from the present jury panel. If counsel for defendant are correct in their contention, then the situation could never be remedied. If every one of the jurors selected for service for the term for which the defendant was tried had belonged to the negro race, his motion to quash the jury panel should have been sustained under his theory merely because there had been exclusion of negroes from performing jury service in the years that had passed.

It is next contended that the court erred in admitting incompetent, irrelevant, and immaterial evidence in

the trial which prejudicially affected the rights of the defendant. This assignment is first directed at the testimony of the witness Bill Clark. This witness testified on behalf of the state that he was a graduate nurse from Bellevue Hospital in New York City, but had been an inmate of the State Penitentiary working at the penitentiary hospital for about a year. In his testimony he described the wounds of the deceased and gave his opinion that any of several wounds described by him would have been sufficient to have produced his death. The evidence complained of was the statement by the witness that the defendant had a slight wound in his back, "I would say exactly like a self-inflicted wound." The record with relation to this matter discloses the following:

"Q. (By Mr. Gotcher, County Attorney) Do you know the defendant, Finley Porter? A. I know him by sight. Q. He is an inmate of the penitentiary? A. He is, yes, sir. Q. Was he brought into your hospital that night? A. He was. Q. Mr. Clark, tell the jury if Finley Porter was injured? A. A slight injury about the size of the end of your finger, like, I would say exactly like a self-inflicted wound, just about the size of the end of your finger. Mr. Redwine: I object to that as an opinion and move it be stricken. The Court: I expect his opinion should be stricken. Q. Mr. Clark, did you probe that wound? A. I did. Q. Explain to the jury just about where it occurred, where the injury occurred. A. I would say about right here. (Indicating.) Q. Now, right underneath there is there a muscle? A. Yes, sir. Q. Structure muscle? A. There is. Q. And when you probed that, Mr. Clark, did your probe go into the muscle? A. It touched the muscle only."

It is apparent from a reading of the above excerpt from the testimony of this witness that counsel for defendant evidently regarded the answer as stricken, as they reserved no exception to the ruling of the court. The jury probably likewise so regarded the statement of the

court as striking said evidence. Since counsel reserved no exception to the ruling of the court, he may not now complain. The question of the county attorney did not call for an expression of an opinion from the witness, and if counsel for defendant had not regarded the statement of the court, "I expect his opinion should be stricken", as being sufficient to strike said evidence from consideration of the jury, they could have called the same to the court's attention at that time and the court could have more specifically struck said evidence from the consideration of the jury.

Counsel for defendant placed a lot of emphasis upon this incident, but a reading of the entire record shows that said evidence was very minor in character and could have had little effect in bringing about the infliction of the death penalty. While the defendant, testifying in his own behalf, claimed that he killed the deceased while acting in self-defense, it is clear when considering the testimony of all the witnesses that deceased had undressed, gone to bed in the upper bunk, and was sound asleep when attacked. The defendant had never removed his clothes. There was no evidence of any struggle, the piece of scissors from which the small flesh wound under the defendant's shoulder blade was made was still sticking in the coveralls worn by the defendant. The witnesses all testified that when they arrived at the cell in response to the calling of the defendant, the deceased was stretched out on the floor in a lifeless position while the defendant was kneeling upon him still whittling him to pieces with the crude but sharp and effective knife which the defendant admitted that he had made from a file. The jury could not have reasonably concluded other than that the flesh wound appearing on the body of defendant had been self-inflicted as a part of the scheme of the defendant

to present a plea of self-defense and justification for his murder of the young negro lad because he refused to submit to the lustful desires of defendant.

This assignment is also directed to the testimony of the witness Henry Mitchell, a former cell mate of the defendant, who testified that a scar on his neck was made by the defendant. This statement was made without any objection on the part of defendant's counsel, but later, after the witness was excused, the court specifically instructed the jury not to consider the testimony of the witness or the remark of the county attorney that "This is a similar type, only he just didn't kill this man." The testimony of the witness was not a voluntary statement, but was in response to the question of the county attorney, "How did you get that, Henry?" and the witness, without any objection on the part of counsel, stated, "He did it." While this evidence was improper, objection should have been made to the question of the county attorney at the time it was asked.

Ordinarily error cannot be predicated upon the admission of evidence without objection. We do not approve of the attempt of the county attorney in endeavoring to get this improper evidence before the jury, but in view of the fact that no objections were interposed to the question, combined with the further fact that the court specifically instructed the jury not to consider said evidence or the remark of the county attorney, coupled with the further fact that the proof of the defendant's guilt of murder is overwhelming, such conduct is harmless.

Counsel next contends that the admission of evidence of photographs of the body of the deceased showing the location of the wounds on the body of the deceased was error. These pictures were taken by a highway patrolman who had had special training in the taking and de-

velopment of photographs. Counsel for defendant contend that said pictures were inadmissible and were introduced solely for the purpose of inflaming the minds of the jurors. The witness testified that at the request of the county attorney he took the picture at the morgue and that said photograph was taken in such a way as "to make it as natural as possible inside the building so as not to cast any shadows, to make it appear as true as possible to the same as the sight." The proof further showed that the pictures as taken clearly showed the deceased's body as it appeared immediately after he was killed by defendant with the exception that one cut on his forehead had been sewed and that said picture was a true reproduction of the wounds on the defendant's body as they existed immediately after he was killed with this one exception.

In Morris v. State, 6 Okla. Cr. 29, 30, 115 P. 1030, 1032, this court had up for consideration the admissibility of photographs taken of the body of the deceased about three weeks after the homicide. In that case this court sustained the admissibility of such evidence and followed the general rule that "where the photograph is shown to be a faithful representation of whatever it purports to reproduce, it is admissible, as an appropriate aid to the jury in applying the evidence, and this is equally true whether it relates to person, things or places," citing Wharton's Crim. Ev. (9th Ed.) sec. 544. Reference is made to Morris v. State, supra, for a lengthy discussion of this subject. We think these photographs were admissible to show clearly to the jury the nature of the wounds suffered by the deceased and which, more than any other evidence, conclusively refutes the contention of the defendant that he had a struggle with the deceased and acted in his own necessary self-defense.

It is next contended that the court erred in failing to give certain instructions to the jury, particularly an instruction on manslaughter. Counsel for defendant presented no requested instructions, no exceptions were saved to the instructions which were given, and such issue was not raised in the motion for new trial. While in an ordinary case we would consider that such failure upon the part of counsel was a waiver of defendant's right to raise such issues on appeal, still, this being a capital case, we perceive it as our duty to carefully read all the instructions which were given to see whether there was error committed. The instructions numbered 18 and fairly and fully cover all theories presented by the evidence. In fact, the court gave several lengthy instructions supporting the theory of the defense. Among these instructions are the following:

"You are instructed that the defendant in this case in support of his plea of not guilty, pleads as a justification of such homicide that while he killed the deceased, he acted in self-defense, and in this connection you are instructed that every person has a right to repel an attack or threatened attack upon his person by the use of force, even to the extent of slaying his assailant, provided he does not use more force than is necessary to repel the attack or threatened attack; and if you believe from the evidence in this case, or entertain a reasonable doubt thereof, that the deceased in such manner as was calculated to excite the mind of the defendant, made an attack upon the defendant, and that such attack was in such a way that the defendant had reasonable grounds to apprehend a design on the part of the deceased to take his life or to do him great bodily injury, and that it reasonably appeared to the defendant at the time that there was imminent danger of such design being carried out, then the defendant was not bound to retreat, but could stand his ground and could repel the attack with such force as was necessary to protect himself from death or

his person from serious bodily harm, even to the extent of killing his assailant, and if the killing occurred under such circumstances the defendant is not held criminally responsible if he acted in self-defense from real and honest convictions as to the character of the danger in which he was placed, although he may have been mistaken as to the extent of the actual danger.

"The court instructs you that under the law it is not necessary that the defendant should have been in actual danger of losing his life, or of receiving serious bodily injury at the hands of the deceased at the time of the alleged assault, but it is sufficient to justify the homicide if the act of the deceased, if any, viewed from the defendant's standpoint and situated as he then was, were such as to reasonably cause the defendant to apprehend that he was in apparent danger of losing his life or having serious bodily injury inflicted upon him by the deceased, and it is immaterial whether the danger was real or not, if it only be apparent, and if you believe from the evidence, or entertain a reasonable doubt thereof, that the killing occurred under such circumstances, then you should find the defendant not guilty.

"The law of self-defense, being a law growing out of necessity, for a person to avail himself of the law of self-defense in order to justify a homicide, it must reasonably appear to him at the time, that the acts and demonstrations upon the part of the deceased were such as to make it reasonably appear to him at the time and situated as he was that he was in imminent danger of either losing his life or of great personal injury being done him, to use at the time all reasonable means appearing to a reasonable person under the circumstances viewed from his standpoint to avoid such danger or apparent danger before taking human life, except that he is not bound to retreat to avoid such necessity of killing, and he must act under the fear of suffering death or receiving serious bodily harm at the hands of the deceased before he would be justified in resorting to taking human life.

"In determining whether or not the defendant was

in danger or apparent danger under these instructions, you are instructed that the law requires you to view the circumstances at the time from the defendant's standpoint and as they then reasonably appeared to him, that is, that the circumstances under which the killing occurred as they reasonably appeared to him were sufficient to excite the fear in a reasonable person that his life was in danger, or that he was in danger of great personal injury being done him, or apparently so, and that he reasonably acted under the influence of such fear at the time; and if, after carefully weighing and considering the evidence in this case you believe from the evidence that the defendant acted in his self-defense from real or apparent necessity as embraced in these instructions, or if you entertain a reasonable doubt thereof, then you should return a verdict of not guilty."

The above instructions, together with others, are somewhat repetitious and for this reason might tend to unduly stress the defense which was interposed, and for that reason, if anything, the instructions were more favorable to the defendant than the law requires. We have concluded from an examination of all the instructions that there is no merit to this contention of defendant.

Lastly it is contended that the county attorney was guilty of misconduct in his argument to the jury. The complete arguments of the assistant county attorney and the county attorney are not set forth in the record. The argument of the county attorney complained of, as shown by the record, appears as follows:

"That boy had gone to sleep, taken his clothes off and gone to bed and gone to sleep, and what does he do? He goes up and sticks a knife in this boy's heart; he struck it in his body while he slept. And that rumbling in there they heard was that boy, as a natural reaction, he rolled off and fell to the floor. * * *

"And the State of Oklahoma is exercising it's right to ask you gentlemen to take that man out of society,

operate on him just like a physician in a hospital would remove a cancerous growth, remove him from society, so that in Texas that little wife of Zeke Beecham cannot go to that cemetery there and sit by that grave and say to that little boy, that little three-months-old boy, that 'We will never go to Oklahoma; you might get into trouble there; you might go to the penitentiary for two years and be killed out there, and the jury should have just given you the electric chair instead of two years, for that man there was executioner, jury, judge and everything else; he took his life.'

"So that it cannot be said that Choctaw county should not have just given him two years, but should have given him the electric chair, as far as life is concerned when a man goes into that penitentiary. I ask you gentlemen, in all regard for justice, to see that there are not men like that in that penitentiary."

The argument of the assistant county attorney that the defendant could not find one witness to come and testify for him and that every witness who testified related facts contrary to the story related by defendant are not improper in view of the record. These statements are apparently the truth, as no witness appeared on behalf of the defendant and the story which he related was in direct contradiction to the physical facts and the other facts related by the various witnesses for the state.

The argument of the county attorney complained of was his deductions from the evidence and they do not appear to us unjustifiable conclusions from the evidence. In Morgan v. State, 9 Okla. Cr. 22, 130 P. 522, it is stated:

"The prosecuting attorney has the right, in his argument before the jury, to discuss all the facts bearing upon the issue within the scope of the evidence. * * *

"Remarks of the prosecuting attorney in his argument before the jury, objected to as improper, will be considered and construed in reference to the evidence;

and, in order to constitute reversible error, the impropriety indulged in must have been such as may have influenced the verdict." See also Allen v. State, 13 Okla. Cr. 395, 164 P. 1002, L.R.A. 1917F, 210.

It is established law that to warrant a reversal of a judgment of conviction on account of the argument of the county attorney, such argument must be grossly improper and unwarranted upon some material point which injuriously affected the defendant's rights. Payne v. State, 21 Okla. Cr. 416, 209 P. 334; Murray v. State, 24 Okla. Cr. 113, 217 P. 891.

Since there has been no question raised as to the sufficiency of the evidence to sustain the conviction, we did not attempt in this opinion to set forth all of the revolting details of the crime. It is sufficient to state that the evidence establishes one of the most cold-blooded and bestial homicides shown by the records of this court. The defendant conceived and carried out an atrocious, unconscionable scheme to force the deceased to submit to demands that he satisfy defendant's lust or be killed. The yelling of the defendant for the cell house guards at a time when Beecham was already lifeless from the knife thrusts of the defendant and the prick in defendant's shoulder with the scissors to support a pretended claim of self-defense were so flimsy and so contrary to the physical facts that his story was wholly unbelievable. The defendant was serving a life sentence when this crime was committed. Death by electrocution is the one punishment to fit such offenders. His previous record and whole conduct show that he has an utter disregard for human life.

Though counsel for defendant appointed by the court have sought hard to sustain the story of self-defense related by the defendant, it is clearly evident that the proof

34

against defendant was so conclusive that only one verdict was possible; in fact, any other sentence than that of death would have been a travesty upon justice.

The time originally appointed for the execution of the defendant Finley Porter having passed pending this appeal, it is ordered, adjudged, and decreed by this court that the judgment and sentence of the district court of Pittsburg county be carried out by the electrocution of the defendant Finley Porter by the warden of the State Penitentiary at McAlester, Oklahoma, on Friday, April 16, 1943.

BAREFOOT, J., concurs.   DOYLE, J., absent.