## JAMES D. PARISH v. STATE.

No. A-10214.    Oct. 27, 1943.

(142 P. 2d 642.)

J. Q. A. Harrod, of Oklahoma City, and Roy B. David, of Durant, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., and S. H. Lattimore, Asst. Atty. Gen., for defendant in error.

JONES, P. J.   The defendant, James D. Parish, was charged by information filed in the district court of Bryan county with the crime of murder, was tried, convicted and sentenced to death and has appealed.

The defendant, at the time of the alleged homicide, was a convict in the Oklahoma State Penitentiary assigned to work in a convict camp near Atoka, Okla. The deceased, W. R. Benningfield, was a carpenter employed by the School Land Department and engaged in supervising the construction of a house by the defendant and other convicts on one of the state farms. About 9 a. m. on August 11, 1941, while working on the house, the defendant complained to the deceased of the stomach-ache. The defendant complained to such an extent that the deceased decided to take him to a doctor in Atoka for treatment. That was the last time the deceased was seen alive. His body was found in a ditch along the road near Kenefic, Okla. An examination disclosed that he had been severely beaten on the head by some blunt instrument causing his death.

The defendant was arrested the next night and placed in the Shawnee jail. Later he was transferred to the State Penitentiary, at which place he gave a statement in writing to the officers of Bryan county concerning the alleged homicide. His statement was as follows:

"Be it remembered:

"That James D. Parish made the following statement on August 13th, 1941, in the office of the Record Clerk, Oklahoma State Penitentiary, McAlester, Oklahoma, in the presence of W. O. Taylor, Sheriff of Bryan County, Oklahoma, Bill Steger, Alan McPheron, and Paul Fields.

"Q. James D. Parish, do you care to make a voluntary statement about your activities on Sunday, Monday, and Tuesday, the said days being August 10, 11, 12th,

1941, respectively, knowing that you do not have to make a statement unless you want to, and that we want said statement to be voluntary, and that we are not offering you any promise of reward for making said statement, and that anything you say in the statement can be used both for and against you in a case of a trial, and it is your constitutional right to refuse to make a statement, and that you can have an attorney present before making the statement? A. I will make a voluntary statement.

"Q. Tell all about your action of August 10, 11, 12, 1941. A. About 7:30 A. M., Monday, August 11th, 1941, Mr. Benningfield, myself, and three other prisoners left the camp 1½ miles north of Atoka, Oklahoma, we drove to Kenefic, Oklahoma, and then drove to the job, which is 1½ miles north of Kenefic, Oklahoma. We got to the job about 8:30 or 9:00 that morning. About 9 or 9:30 that morning I started having cramps in my belly. Mr. Benningfield decided to take me to a Doctor in Atoka, Oklahoma, so I could get treated for the cramps.

"We got in Benningfield's car, which was a tudor Nash, 1941 model, I got in the back seat and laid down, Benningfield was driving. We drove to Kenefic, and turned east toward Caddo. After we had gone two miles east of Kenefic, we got in a rukus because he was talking about my family.

"I hit him with my fist one time. He hit at me first with his fist and missed me. Then he started to his pocket like he was going to get a knife, then I picked up a hammer and hit him about four or five times in the head.

"The car was stopped when this rukus took place. I told him while we were driving to stop the car so I could take a crap. I went out in a corn field and took a crap. Then I came back to get in the car, I was getting in the front seat to ride there with him, when he hit at me. I dodged the blow, and then the rukus took place.

"After I knocked him out I put him in the back seat, he raised completely up and then laid back down in the

back seat—then I drove the car off. I turned the car around right there and headed the car west. I drove west seven or eight miles and then threw him out of the car. I threw him in a ditch on the right side of the road. I put him about (Signed: James D. Parish) fifteen feet from the road, in a small hole with Johnson grass and weeds around it. He was still alive when I put him on his side. When I picked him up, I picked up a blanket that was in the back seat, and I left this blanket under him when I laid him down.

"I turned the car around after I crossed the bridge, then head south two miles, and then turned west and went until I got to the highway. I went through some little towns and then got to Ada, Oklahoma. Then I drove to Wewoka. While I was in Wewoka, I tried to back the car up, I got the shift hung in reverse and couldn't get it out of reverse. I then parked the car and walked off. I walked away from the road and hit a timber strip. I would walk a little then sit down and rest and then start walking again. It was between 1 and 2 P. M., when I left the car. I milled around the rest of the afternoon and that night in the woods. I would walk some then rest and sleep.

"About noon the following day I went to a farmer's house and told him the circulation in my car was stopped up, and that I needed some lye to un-stop the radiator. The farmer gave me a full can of lye and I gave him 15¢ for it. I walked about one mile, then I stopped at a little branch, I mixed some lye and water in a Prince Albert tobacco can and drank it. It made me sick and I laid around out there the balance of that day. About 8 or 9 that night I went over to the highway and caught a ride with some boys. The boys took me to a hospital in Shawnee. I asked these boys to take me to a hospital, and they took me to one.

"Mr. Paul Fields and Mr. Mann talked to me in Shawnee, Oklahoma, on August 12th, 1941, and I told them about killing Mr. Benningfield, and told them where his body was. This morning, August 13th, 1941, at about

3:30 A. M., I showed Mr. Paul Fields and Mr. Mann and some other officers where his body was. I showed them where the rukus came up.

"Q. Have you read this statement of two pages, and is it the statement you made, and is it the truth? A. I have read it, and it is what I said, and it is true.

"Signed August 13th, 1941.

"(Signed) James D. Parish
"James D. Parish.

"Witnesses:

"(Signed) W. O. Taylor

"Paul Field

"Alan B. McPheron."

The deceased was a man about 60 years of age who weighed less than 140 pounds. The defendant, at the time of the homicide, was 37 years of age and weighed 217 pounds.

Counsel for defendant presented a plea of self-defense and temporary insanity, although the testimony of the defendant concerning the actual homicide did not, in any way, show a temporary insanity, but his defense, according to his own testimony, was solely that of self-defense.

The wife and some relatives and friends of defendant testified that a few years before the date of the homicide, the defendant had been riding in an automobile which collided with a train causing the defendant to sustain severe injuries. That subsequent to the collision the defendant had hallucinations or mental lapses when he conjured up imaginations that he was being chased or wronged by certain people.

The circumstances surrounding the homicide as testified by the defendant related a history of defendant's

association with the deceased. It was claimed by the defendant in his testimony that the deceased had made derogatory remarks about his wife and children which humiliated and enraged him. That these remarks were first made about a week before the time of the alleged killing. That on the date of the homicide, the deceased, together with the defendant and two other prisoners, was working near Kenefic building a house under the supervision of the deceased. That early that morning the defendant complained of the stomach cramps and was advised by the deceased to rest awhile and if he didn't feel better that he would take him to Atoka to a doctor. That he rested about 30 or 40 minutes and felt worse and told the deceased how he was feeling. That the deceased then asked him to get in his car and they started on the road to Atoka. That on the road he asked the defendant to stop so that he might get out for a bowel movement. That when he came back to the car the defendant started an argument again about his wife and he told the defendant to drive him before the superintendent and let him take him back to the walls, and the deceased said he would not do it. That he started to get into the car and the deceased said "Damn you," and hit at him and then said "Get in this car." That deceased then hit him over the eye and started to put his hand in the glove compartment and defendant shoved him back and then hit him with a hammer several blows. That he then put him in the back seat and started to a hospital and he noticed that the deceased had died so he stopped and laid him in a bar ditch. That after this occurred defendant got back in the automobile and his mind went blank and he, according to his testimony, did not recall anything that he did after that time until he was taken back to the penitentiary.

It is first contended that the court erred in overruling the defendant's motion for a new trial because of the disqualification of one R. W. Reeves to sit as a juror in said case, which disqualification was unknown to the defendant until after the verdict was rendered and the jury discharged.

In connection with this assignment of error, the defendant alleges that the juror Reeves was deaf to such an extent that he was disqualified to act as a juror.

38 O. S. 1941 § 10 provides:

"All male citizens residing in this state, having the qualifications of electors, of sound mind and discretion, of good moral character, not justices of the Supreme Court, or judges of the Criminal Court of Appeals, District Court, Superior Court, Court of Common Pleas, or County Court, sheriffs, or deputy sheriffs, constables. jailers, licensed attorneys engaged in the practice of law, habitual drunkards, not afflicted with a bodily infirmity amounting to a disability, and who have never been convicted of any infamous crime or served a term of imprisonment in any penitentiary for the commission of a felony, are competent jurors to serve on all grand and petit juries within their counties: Provided, that persons over sixty years of age, ministers of the Gospel, and county or district officials, practicing physicians, dentists, undertakers, pharmacists, teachers in public schools, postmasters, carriers of the United States mail, members of the National Guard, persons actually engaged or employed in the publication of a newspaper, and all members of good standing of any regular organized fire department, if they claim their exemption, shall not be compelled to serve as jurors in this State."

Upon the hearing of defendant's motion for a new trial, the defendant produced the juror Reeves as a witness in support of his motion and he testified concerning his alleged disability as follows:

"Q. What is your name?   A. R. W. Reeves.   Q. Do you know what seat—which one of the chairs in the jury box you occupied in the trial of this case?   A. I think it was this chair here. (Indicating)   Q. Can you hear good? A. Well, I could from there.   Q. As a matter of fact, haven't you told different people that you were hard of hearing?   A. I do not have normal hearing, but I can hear everything under ordinary circumstances.   I can hear pretty good.   Q. Hasn't different people had difficulty in having a conversation with you and you would have them repeat it again?   A. Well, if there are interruptions and noises, yes.   Q. Then you admit your hearing is not good?   A. It is not normal.   Q. When is it normal and when is it not normal?   A. Well, if a person is too far away I don't hear so well, and some people's voices don't carry as well as others, and if there is a commotion and other noises I can't hear as well.   Q. You think then that during all of the time of this trial, that you could hear every word?   A. I think I heard every word of it.   Q. Could you hear the defendant plainly when he was talking? A. Yes, sir."

All of the argument of defendant in connection with this assignment of error is based on the assumption that the proof of the defendant definitely established that the juror was afflicted with a bodily infirmity amounting to a disability.   It is admitted that the defendant did not question the juror Reeves on his voir dire examination as to his qualifications, but it is insisted that even though in an ordinary case it might be held that the defendant had waived any question as to the alleged disqualification of a juror by his failure to seasonably object to his competency, since this is a capital case this court will consider the question and if it is found that the juror is in fact disqualified award the defendant a new trial.

In the case of Cooper v. State, 27 Okla. Cr. 278, 226 P. 1066, it is held:

"It is the duty of the defendant to question the jurors on their voir dire as to their qualifications; and if he fails to do so, he waives any objections on that point, even though the disqualification is unknown to him until after the rendition of the verdict.

"The granting of a new trial in such a case is a matter of discretion."

In the body of the opinion it is stated:

"A defendant will not be permitted to speculate on the result of a verdict to be rendered by a jury of which some member may be disqualified, and later challenge the verdict if, perchance, it should not be to his liking. The defendant must exercise diligence to ascertain the qualifications of jurors at the time they are examined for that purpose. Queenan v. Territory of Oklahoma, 11 Okla. 261, 71 P. 218, 61 L.R.A. 324; Id., 190 U.S. 548, 23 S.Ct. 762, 47 L.Ed. 1175; Raub v. Carpenter, 187 U.S. 159, 23 S.Ct. 72, 47 L.Ed. 119; Papernow v. Standard Oil Co., D.C., 228 F. [399], 400." See, also, in this connection Brown v. State, 14 Okla. Cr. 609, 174 P. 1102; David v. State, 14 Okla. Cr. 535, 179 P. 48; Tinney v. State, 19 Okla. Cr. 126, 201 P. 819; Peters v. White, 169 Okla. 640, 38 P. 2d 523.

The defendant is correct in his contention that this court, in a capital case, will review the entire record and consider all matters presented which are supported by the record, whether such assignments of error are properly preserved or not, in order to determine whether the extreme punishment assessed the defendant is justified under the record or whether the verdict was procured by reason of some irregularity or error in the proceedings which prevented the defendant from having a fair and impartial trial.

After a thorough consideration of this assignment of error, in view of the testimony of the juror and in the

absence of any contradictory evidence, it is apparent he heard all of the testimony. The witness admitted a slight deafness but he was very definite in his statement that he heard all of the examination of the witnesses, including the testimony of the defendant. In view of this state of the record it is not necessary for us to determine whether the alleged disqualification of the juror, if true, was sufficient to invalidate the verdict.

The second and only other contention presented by counsel for defendant is that the punishment is excessive and should be modified.

In considering this assignment of error it should be borne in mind that the statute, section 3204, O. S. 1931, 22 O. S. 1941 § 1066, vesting in this court authority to reverse, affirm or modify the judgment on appeal, is not unlimited. It must be the exercise of a judicial power, as distinguished from the executive power of commutation, reprieve, pardon or parole. This court may only modify a judgment as an award of justice, while the executive power of clemency is conferred as a matter of grace.

As was stated in the case of Moore v. State, 75 Okla. Cr. 222, 130 P. 2d 114, 118:

"The power conferred on this court to modify a sentence as a judicial act makes it the duty of this court in a capital offense to examine the entire record and to carefully weigh and consider the evidence, including the evidence as to defendant's sanity at the time of the homicide, the instructions of the court given and those refused, in order to ascertain if, in the furtherance of justice, the judgment and sentence of death should be reduced to life imprisonment."

It is urged that the defendant's physical condition is now such, because of the drinking of the lye after the commission of the homicide, that this court should consider

that in connection with the other matters set forth in the record, and in the furtherance of justice modify the death penalty to that of some lesser sentence. With this we cannot agree. If the defendant's physical condition is such that the Chief Executive of this state feels that under the circumstances he should not suffer the extreme penalty of death, then, in his wisdom, under the constitutional provision vesting in him exclusive authority to issue clemency, he may commute the sentence imposed on the accused. But the defendant's present physical condition, incurred after the commission of the alleged homicide, is not a proper matter to be considered by this court in passing solely upon legal questions presented by the record to determine whether the defendant is guilty of the crime charged, and whether, in the course of the proceedings in the trial court, he was denied a fair and impartial trial. His physical condition was brought about by a deliberate act committed on his own person many hours after the homicide and does not affect the questions of law which this court must determine in the disposition of this appeal.

We have carefully considered the instructions of the court and the various rulings made by the trial court on the admissibility of evidence and other matters in connection with the trial. The instructions fairly presented the issues to the jury. There is no contention by the able counsel for defendant, that there was any error in the instructions and that they were not as favorable to the defendant as the law authorizes in such cases. In so far as the facts are concerned, the jury was fully justified in concluding that the accused feigned an illness, and that the deceased, while acting as defendant's benefactor and taking him to a physician for treatment of his supposed illness, was bludgeoned to death by the defendant, who

thereupon stole the automobile of the deceased and made his escape. Under such a state of facts, the jury was fully justified in assessing the extreme penalty of the law.

The judgment of the district court of Bryan county is therefore affirmed.

The date originally appointed for the execution of the defendant, James D. Parish, having passed pending this appeal, it is ordered, adjudged and decreed by this court that the judgment and sentence of the district court of Bryan county be carried out by the electrocution of the defendant, James D. Parish, by the warden of the State Penitentiary at McAlester, Okla., on Friday, January 14, 1944.

BAREFOOT, J., concurs. DOYLE, J., absent.