## LAWRENCE WATERS v. STATE.

No. A-10884.   Sept. 1, 1948.
(197 P. 2d 299.)

238

Frank Leslie, of Tulsa, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., Sam H. Lattimore, Asst. Atty. Gen., and James P. Devine, Asst. County Atty., Tulsa County, and Amos T. Hall, Sp. Pros., both of Tulsa, for defendant in error.

BAREFOOT, P. J.   Defendant, Lawrence Waters, was charged in the district court of Tulsa county with the crime of murder; was tried, convicted, and given the death penalty.   From this judgment and sentence, he has appealed to this court.

When this case was assigned for oral argument, counsel who now represents this defendant and who filed

the brief herein, but who did not represent him at the trial in the lower court, appeared and orally argued the same.

Three errors are presented: That the court erred in refusing to sustain a motion for continuance; that the court should have instructed the jury with reference to manslaughter in the first degree; and that the judgment and sentence rendered is excessive and should be modified from all the facts and circumstances in this case.

We deem it proper to give a brief statement of the facts, before considering the assigned errors.

Defendant, Lawrence Waters, was charged in the district court of Tulsa county with murdering Arthur Bell, in the city of Tulsa, on December 6, 1946, by shooting him with a shotgun. Both defendant and deceased were members of the Negro race, and both resided in the city of Tulsa.

The facts, as revealed by the record, are that Arthur Bell was running a small restaurant or cafe at 1003 East Young Place, in Tulsa. He lived at 1001 East Young Place, his residence adjoining his place of business. He had two sons, Theopolis, age 10 and James, age 12. They were both eyewitnesses to the killing of their father, and both testified for the state.

About 4 o'clock in the afternoon on December 6, 1946, the defendant, with his brother Harold Waters, his sister Ernestine Waters, his common-law brother-in-law Lawrence Vaughn, and a girl named Jessis Mae Garner, went to the cafe of Arthur Bell. They were in an automobile, driven by Lawrence Vaughn, and all entered the cafe and were seated in a booth. They ordered a pint of whisky, which was delivered to them by Arthur Bell, and was paid for by Harold Waters, brother of defend-

ant. These facts are all testified to by both the witnesses for the state and the defendant.

The two sons of the deceased both testified that after the defendant's party was served with the whisky they all left the place. That there was no misunderstanding as to the change, and no controversy of any kind. That Harold Waters gave their father a bill, and he gave him back some change. They also testified that they both went to the door and that their father did not kick or shove either the defendant or Lawrence Vaughn off the porch. That their father did not at any time have a gun in his hands, and did not threaten to kill any of the parties. The only thing said by their father was that he asked Harold Waters and Lawrence Vaughn to quit cursing in their presence. That all of the parties left together in the automobile about 5 o'clock in the afternoon.

Four of the five members of the party testified for the defendant. Jessie Mae Garner did not testify, as she was in a hospital. All of the witnesses for defendant testified to entering the cafe and purchasing the pint of whisky from Arthur Bell, and that Harold Waters handed Bell a $10 bill, and was only handed back in change $2.50. That there was a controversy with reference to the amount of change, and the bottle of whisky was spilled and the witness Lawrence Vaughn tried to get Arthur Bell to replace the liquor. They all testified that Bell went into his near-by home and returned with his pistol in his hand and ordered them out of his place, kicking the defendant, and shoving the witness Lawrence Vaughn off the porch. There were some slight conflicts in their testimony, but this was the gist of it. They all testified that Arthur Bell threatened to kill them; that they had trouble with their car and had to push it to

get it started; that Lawrence Vaughn was driving and Arthur Bell was standing on the porch with his gun in his hand threatening to kill them and ordering them to get away from his place of business.

The defendant and his witnesses further testified that they went to the home of defendant's father, and that the witness Lawrence Vaughn was drunk and laid down on the bed and went to sleep, and the sister Ernestine left the premises. In about one hour or around 6 o'clock in the afternoon, Harold Waters, the brother of defendant, told defendant he was going back to the home of Arthur Bell to get his change. He wanted the defendant to go with him, and defendant at first refused to go, and tried to get his brother not to go. Defendant then agreed to go with his brother Harold, but told him he would not go without his gun. He then took a double barrel shotgun, which was in two parts, from under the father's bed, secured shotgun shells from the pocket of a coat, and he and his brother proceeded toward the home of Arthur Bell, a distance of some seven or eight blocks. Just before reaching the home of Arthur Bell, defendant put the gun together and loaded it. When they reached the home of Bell, Harold Waters went to the door and knocked. Defendant remained on the outside near a window with the gun in his hand. Harold Waters entered the house, and present were the deceased and his two sons, Theopolis age 10, and James age 12.

The two sons testified that Harold Waters asked to borrow money from their father, and that the father told him he could not lend him money, but if he was hungry he would give him something to eat. That Harold Waters told their father to give him something to eat, and their father told the older boy to get a sandwich, which he did, and when he returned with the sandwich and hand-

ed it to Waters, a shot was fired through the window, and the father, who was sitting in a chair, was struck in the face. He was assisted by his son James and walked to another room. He died as a result of said wounds. Both the boys testified that they ran to the back yard and both saw Harold Waters and the defendant Lawrence Waters running from the premises. That the defendant had something in his hands.

On the same night, between 9 and 10 o'clock, the defendant and his brother Harold Waters were arrested, and both made statements to the officers with reference to the killing.

In his written statement, Harold Waters said nothing about a controversy over the change, or about seeing any one kicked or pushed by deceased. He denied in the statement that he was at the deceased's place after Bell ordered them away; and that he was not present at the time the shot was fired. He also denied that his brother gave him the gun, after the killing, or that he knew where the gun was. On the trial of the case, Harold Waters admitted that all of these statements were untrue; that he was present at the time of the shooting, and gave the details of him and his brother going to the home of Arthur Bell, and of the shooting. His testimony as to the actual shooting was as follows:

"A. I asked him for my change again and he got angry again, so I gets up to leave and then is when it all happened. Q. Then a shot was fired from the outside? A. That is right. Q. And that shot was fired by your brother? A. Well, I didn't see him fire. Q. Well, he was outside with the gun, was he not? A. He was outside. Q. Did you go in there that evening, after you went back, and tell Arthur Bell that you wanted to borrow some money? A. No, I didn't. Q. Did you tell him that you were sick? A. No, I didn't. Q. Did they

offer you anything to eat? ? A. No. Q. You did not get any sandwich there at all, did you? A. No. Q. Or anything else to eat? A. Nothing else."

Defendant testified in his own behalf and stated that he was 28 years of age. That he served in the United States Military services for three years during the war, and served two years in Italy in the quartermaster's department. He was finally discharged in January, 1946. He corroborated the other witnesses as to the happenings up to the time of the firing of the fatal shot. He stood at the window while his brother entered the house of Arthur Bell. He testified that he could not see his brother in the house, but could see Arthur Bell, who was sitting in a chair. He saw him making motions with his hand, and saw him make a quick move toward the bed, over towards the pillow. He thought he was reaching for a gun to shoot his brother, and he fired the shot through the window that killed Arthur Bell. The defendant, in company with his brother, left the scene of the killing, and before getting to his father's home, he gave the gun to his brother, Harold, and he started over to his aunt's. He soon returned to his father's home and was arrested there by the officers. He made a written statement to the officers on the night of his arrest, as follows:

"December 6, 1946. This is a statement of Lawrence Edward Waters on the shooting of Arthur Bell of this city about 6.35 p. m. This happened at 1001 East Young Place.

"Question: Lawrence, you told me that you shot Arthur Bell, didn't you? Answer: That is right.

"Question: Just tell me in your own words about your going out there today and what happened and why you went back and shot him. Answer: I bought a pint of whisky off Bell and he was already drinking and he told me to get out of his house. I went out on the porch and then

I wanted my sister and she came out and then Bell came out and he kicked me and told me to get off the porch and kept my sister there; then after we, Harold Waters, Ernestine Waters, Jessie Mae Garner and Lawrence Vaughn left and went up the street and stopped the car, I then sent Jessie Mae back after my sister and she met her half-way and they came on back to the car. We then came on back to town, or that is to my house, and then I went into my house and got a 12-gauge shotgun and some shells and went back to Bell's house and walked into the front of the house and saw him sitting at the window with his face to me, and then I let him have it through the window with one shot, then I walked off afoot and went to my father's house. After I shot Bell I walked down to Midland Valley tracks, where I met my brother and gave him the shotgun. Harold Waters is the brother.

"This statement is made of my own free will and accord. After having read the beforesaid statement, I find the same to be true and correct.

"(Signed)

"Lawrence Edward Waters

"In the presence of
"Brick Fowler
"A. W. Berry
"A. Ferguson,
"Members of the police department."

While testifying at the trial, he stated that certain parts of the statement were not true.

Several witnesses testified to the general bad reputation of deceased, and some as to his reputation as a quarrelsome, turbulent, over-bearing and dangerous individual. Among these witnesses were a number of peace officers of Tulsa county.

It was also revealed by the record that defendant had been in trouble most of the time since 1925. He had

been to the penitentiary at least twice for burglary and larceny.

As to the first error presented, that defendant should have been granted a continuance, the facts are that defendant was arrested on the charge of murder on the night of December 6, 1946. A complaint was filed in the justice court, a preliminary examination was held, at which time he was represented by counsel of his own choosing, Hon. S. S. Lawrence, of Tulsa. Information was filed in the district court of Tulsa county on December 31, 1946. On January 8, 1947, defendant was arraigned in the district court, and was at that time represented by Mr. Lawrence. On February 6, 1947, Mr. Lawrence accepted service, as attorney for defendant, of a list of witnesses to be used by the state at the trial. Some time subsequent to the preliminary hearing, Mr. Lawrence was notified by the brother of the defendant that they desired to change counsel. On February 21, 1947, the day the case was set for trial, Mr. Lawrence sought to withdraw as counsel, but this request was denied by the court. A motion for continuance was made for the reason that counsel had not had time to prepare for trial, for the reason that defendant and his relatives had notified him only a few days prior to February 21, 1947, that they desired him to proceed as attorney for defendant. The motion for continuance was overruled and the case was passed until February 24, 1947. On that date the case was called for trial, and no further motion or request for continuance was made. The names of no witnesses who could not be present at the trial were presented, and no affidavits, as required by the statute, were presented.

From the above statement it is apparent that, under the law, as often announced by this court, there was

no error in overruling the motion for continuance. All of the witnesses who were present in the afternoon, except one, and at the time of the killing, testified at the trial. The testimony of the absent witness, Jessie Mae Garner, would have been only cumulative, and she was not present at the time of the killing. The attorney selected by defendant to represent him at the preliminary, and at his arraignment, and who was thoroughly familiar with his case, represented him at his trial. The trial court was right in refusing counsel permission to withdraw from the case, and in overruling the motion for continuance.

As to the contention of defendant that the court erred in failing to give an instruction on manslaughter in the first degree in this case, we have carefully examined the record and the law of the cases heretofore decided by this court. The record here reveals that no requested instruction was presented by defendant, and that no such error was presented in the motion for new trial, or in the assignment of errors. However, if it were found from the record in this, a death penalty case, that fundamental error had been committed, we would not hesitate to consider the same, regardless of the fact that it was not presented in the motion for new trial, or in the assignment of errors. From the record in this case, we have come to the conclusion that the court did not commit error in failing to give an instruction on first degree manslaughter, although it would not have been error if he had seen proper to give such an instruction.

From an examination of the record, it may be ascertained that the state, represented by the county attorney and a special prosecutor, contended that the defendant and his brother, before their departure from the home of their father, had entered into a conspiracy or

agreement to kill Arthur Bell; that they carried the shotgun in two parts in order to conceal the same; that the brother of defendant entered the home of the deceased for the purpose of placing him in a position to be killed by the defendant, and that the brother, in lying down upon the bed as testified to by the little boys, did so for the purpose of keeping out of range of the shot which killed the deceased. There was evidence and circumstances which would have justified this contention. On the other hand, the defendant testified that the deceased was making motions with his hands, and he was afraid that he was going to kill his brother, and that he saw him reaching toward the pillow on the bed and thought he was reaching for a gun. The brother of defendant, however, did not testify to any overt act on the part of deceased.

As far as the law is concerned, it is expressed in the case of Smith v. State, 77 Okla. Cr. 142, 140 P. 2d 237, 241, where the facts were somewhat similar to the facts here. It was there said:

"From the above statement of the evidence, and the reading of the authorities, it is revealed that the testimony of the state clearly shows a case of murder. The evidence of the defendant is based squarely upon justifiable homicide, his own testimony showing that he went to the scene of the difficulty at night, armed. It is probably true that he did not intend to kill the boy Mansfield Postum. But if he intended to kill the father, Nathaniel Postum, as testified to by the State's witnesses, his actions would constitute murder. If his testimony was true, he would not be guilty. This was the view taken by the trial court, and for this reason he did not submit the issue of manslaughter in the first or second degrees.

"The statute provides (section 2223, O. S. 1931, Tit. 21 O. S. A. 1941 § 711):

" 'Homicide is manslaughter in the first degree in the following cases:

" '1. When perpetrated without a design to effect death by a person while engaged in the commission of a misdemeanor.

" '2. When perpetrated without a design to effect death, and in a heat of passion, but in a cruel and unusual manner, or by means of a dangerous weapon; unless it is committed under such circumstances as constitute excusable or justifiable homicide.

" '3. When perpetrated unnecessarily either while resisting an attempt by the person killed to commit a crime, or after such attempt shall have failed.'

"And sec. 2228, O. S. 1931, Tit. 21 O. S. A. 1941 § 716:

" 'Every killing of one human being by the act, procurement or culpable negligence of another, which, under the provisions of this chapter, is not murder, nor manslaughter in the first degree, nor excusable nor justifiable homicide, is manslaughter in the second degree.'

"A careful analysis of these statutes has been made in the case of New v. Territory, supra [12 Okla. 172, 70 P. 198]. The court submitted to the jury an instruction on the law of self defense which fully covered the issue of justifiable homicide. There was no evidence which warranted the submitting of the issue of manslaughter in the second degree.

"We do not find from an examination of the facts in the case at bar that the trial court erred in failing to present these issues to the jury.

"For the reasons above stated, the judgment and sentence of the district court of Pittsburg County is affirmed."

In the case above quoted, reference is made to the case of New v. Territory, 12 Okla. 172, 70 P. 198, 200.

We refrain from quoting extensively from this case, but the facts are very similar to those in the case at bar. A full exemplification of the law is given as to the duty of the court in giving instructions on murder, and manslaugher in the first and second degrees. The court there says:

"Where the evidence of the prosecution shows the killing to have been murder, and the evidence of the defendant tends to show the killing to have been justifiable, it is only necessary that the instructions of the court should cover the law of the case as shown by the evidence. * * * Viewing the evidence of the defendant alone from its most favorable standpoint, only one of two conclusions could have been arrived at by the jury: First, if the case for the prosecution was made out, the verdict must have been for murder. If the theory of the defendant was sustained, then the homicide was justifiable. As we view the defendant's testimony, from the record, however, taking it as a whole, and particularly the acts of the defendant from the beginning of the shooting until the end, we do not see how the jury could have arrived at any other conclusion than that the defendant was guilty of murder."

The court held that it was not error to refuse to give an instruction on manslaughter in the first degree. There, as in this case, such an instruction was not requested.

It is next contended that the judgment and sentence of death, under the record in this case, is excessive, and that justice demands that the judgment and sentence should be modified, if it is sustained.

We have often held that this court has the power to modify a judgment and sentence inflicting the death penalty to a term of life imprisonment in the State Penitentiary. With this in mind, we have carefully examin-

ed the record in this case. We find that Arthur Bell was engaged in the sale of intoxicating liquor at his place of business in the city of Tulsa, in violation of the laws of his state. He sold a pint of whisky to defendant and his party. There is a conflict in the evidence as to what occurred at the time this whisky was purchased by the brother of the defendant. This conflict has before been stated. The fact remains that for some reason the brother and defendant returned to the place of business or home of deceased. This somewhat corroborates the statement of the defendant and his brother as to their reason for returning  Aside from the incident in the afternoon preceding the killing, there had been no controversy or ill feeling by the defendant toward the deceased. No motive is shown for the killing. Defendant had only been back a short while from two years service overseas in the United States Army. The undisputed evidence reveals that deceased was a quarrelsome, overbearing and dangerous person, and that his general reputation in the city of Tulsa was bad. This evidence was given by a number of disinterested citizens, and by a number of peace officers who had served for many years in the city of Tulsa. It is true that the record of the defendant prior to his entry into the army was bad, but there is no evidence of the violation of any law after his return.

With this record before us, and an examination of many cases decided by this court where the judgment and sentence has been modified from death to life imprisonment, we have come to the conclusion that justice demands in this case that the judgment and sentence of the district court of Tulsa county should be modified from death to a term of life imprisonment in the State Penitentiary at McAlester, with the firm belief that no

pardon and parole board of this state will grant a pardon or parole to this defendant for many, many years. Life imprisonment is a very great punishment, and a number of states have altogether prohibited capital punishment. Our experience as Judges and as members of the bar of this state for many years has convinced us that capital punishment is a very just and necessary law in Oklahoma, and that justice demands that it be maintained. But its application should only be in those cases where the evidence is such that demands the death penalty.

The earlier cases where the judgment and sentence has been modified from death to life imprisonment are cited in the case of Mannon v. State, 68 Okla. Cr. 267, 98 P. 2d 73. Some of the later cases are Moore v. State, 75 Okla. Cr. 222, 130 P. 2d 114; Murphy v. State, 72 Okla. Cr. 1, 112 P. 2d 438; Benton v. State, 86 Okla. Cr. 137, 190 P. 2d 168; Mitts v. State, 82 Okla. Cr. 367, 170 P. 2d 563; Easley v. State, 78 Okla. Cr. 1, 143 P. 2d 166.

Where the judgment and sentence was not modified: Abby v. State, 72 Okla. Cr. 208, 114 P. 2d 499, 115 P. 2d 266; Tuggle v. State, 70 Okla. Cr. 83, 104 P. 2d 726 and 73 Okla. Cr. 208, 119 P. 2d 857; Norman v. State, 81 Okla. Cr. 78, 160 P. 2d 739; Cunningham v. State, 70 Okla. Cr. 131, 105 P. 2d 264; Broyles v. State, 83 Okla. Cr. 83, 173 P. 2d 235; Johnson v. State, 79 Okla. Cr. 363, 155 P. 2d 259; Bingham v. State, 82 Okla. Cr. 5, 165 P. 2d 646; Johnson v. State, 82 Okla. Cr. 437, 172 P. 2d 337; Steen v. State, 82 Okla. Cr. 141, 167 P. 2d 375; Porter v. State, 76 Okla. Cr. 16, 133 P. 2d 903; Kidd v. State, 76 Okla. Cr. 213, 136 P. 2d 210; Parish v. State, 77 Okla. Cr. 436, 142 P. 2d 642; Prather v. State, 76 Okla. Cr. 385, 137 P. 2d 249; Grayson v. State, 85 Okla. Cr. 266, 188 P. 2d 696.

It will thus be noted that of the nineteen cases where the death penalty has been assessed since the Mannon case was decided, five have been modified, and fourteen affirmed.

In considering the question of whether justice demands that the judgment and sentence in this case be modified, we have re-read all of the cases cited in the Mannon case, and here cited. A comparison of the facts in those cases and the facts here presented have been carefully compared, and after this comparison, we have reached the conclusion that justice demands the judgment and sentence in this case be modified from death to life imprisonment.

In the case of Easley v. State, supra, this court, in quoting from the case of Hubka v. State, 40 Okla. Cr. 161, 267 P. 864, said [78 Okla. Cr. 1, 143 P. 2d 180]:

" 'The duty imposed upon the court of protecting the taking of human life is a grave and solemn one; to take the life of a human being, even when taken by the law, is a trying and grievous task. Considering the whole testimony in this case, we feel constrained to say that we find few palliating circumstances in behalf of the defendant. * * *

" 'Taking all the facts into consideration and the enmity and feeling that seems to have existed between them, we are of the opinion that the punishment imposed is excessive, and that justice requires a modification of the judgment and sentence of death to that of imprisonment at hard labor in the State Penitentiary for life, and, as so modified, the judgment herein is affirmed.' "

And quoting from the case of Easley v. State, supra:

"See, also, State v. Young [19 Okla. Cr. 363, 200 P. 260], and Walker v. State [20 Okla. Cr. 319, 202

P. 799] cited in the Bradley case, supra, [Bradley v. State, 31 Okla. Cr. 194, 237 P. 625] and Methvin v. State, 60 Okla. Cr. 1, 60 P. 2d 1062; Holford v. State, 57 Okla. Cr. 431, 48 P. 2d 1082; and Goben v. State, 32 Okla. Cr. 237, 240 P. 1085.

"Eliminating the defense offered in this case, the facts are not such that justify the inflicting of the death penalty, as shown by the authorities above cited. There being no evidence of ill will between the defendant and deceased prior to the morning that they had a fuss just prior to the killing, and no motive being shown as to why the defendant should desire to kill his own wife, and the errors heretofore discussed as revealed by the record in this case, we cannot but come to the conclusion that justice demands a modification of this judgment from that of death, to a term of life imprisonment at hard labor."

In the case of Moore v. State, supra [75 Okla. Cr. 222, 130 P. 2d 119], we said:

"The penalty of death as a punishment of crime is to be inflicted only in the most extreme cases. It is a matter of record that the members of this court favor the infliction of the death penalty in cases where the evidence and the law justify. Here there was an utter lack of motive. Both of the deceased were friends of defendant. He had had no harsh words with the deceased, although he had asked a brother of deceased to lend him money to go to Texas. * * *

"No more solemn duty can be imposed upon the courts than the duty of protecting, and the duty of taking, human life. To take the life of a human being is an awful thing, even when it is taken by the law."

The Moore case was modified to life imprisonment. See, also, the case of Sapp v. State, 83 Okla. Cr. 53, 172 P. 2d 643.

In the case of Murphy v. State, supra, quoting from Methvin v. State, 60 Okla. Cr. 1, 60 P. 2d 1062, it is said [72 Okla. Cr. 1, 112 P. 2d 457]:

" 'The law regards human life as the most sacred of all interests committed to its protection; and no more solemn duty can be imposed upon the courts than the duty of protecting, and the duty of taking, human life. To take the life of a human being is an awful thing even when it is taken by the law in the due administration of justice.' "

And quoting from Anthony v. State, 12 Okla. Cr. 494, 159 P. 934:

" 'The power of this court to modify a judgment inflicting the death penalty for murder to imprisonment for life at hard labor, when deemed proper in the furtherance of justice, is not the power to commute by the chief executive of the state. The judicial power to modify a judgment and the executive power to pardon or commute are wholly distinct in their nature. The one is an award of justice. The other is an act of grace.' "

We conclude this opinion with the statement in the case of Sapp v. State, supra [172 P. 2d 650]:

"It is our conclusion that the facts surrounding this crime do not justify the assessing of the extreme penalty of the law, and the judgment and sentence of death should be modified to provide that defendant, Jess Vaughn Sapp, be imprisoned in the State Penitentiary for life at hard labor. Surely this defendant, with a record of six convictions in felony cases, will never be allowed outside the prison walls again, but that in reality he should be forced to spend the remainder of his days confined to the penitentiary at hard labor, and, if this is done, such punishment will be ample for the crime which was committed."

The judgment of the district court of Tulsa county is therefore modified from death by electrocution, to life

imprisonment in the State Penitentiary at McAlester, at hard labor; and as so modified, is affirmed.

JONES and BRETT, JJ., concur.