## J. J. BIRDWELL v. STATE.

No. A-3625.    Opinion Filed Sept. 8, 1921.
Rehearing Denied Dec. 2, 1922.
(210 Pac. 558.)

(Syllabus.)

1.    Appeal and Error—Verdict Sustained by Substantial Evidence not Disturbed. Where there is substantial evidence to show the guilt of the accused, the appellate court will not weigh the sufficiency of the evidence to sustain a conviction, but will consider the whole evidence to ascertain whether a conviction is founded on substantial evidence.

2.    Evidence—Circumstantial Evidence to Show Conspiracy. A conspiracy may be shown by circumstantial evidence.

3. **Homicide—Evidence Showing Conspiracy to Murder.** In a prosecution for murder, evidence held to show the existence of a conspiracy to kill and murder.

4. **Homicide—Evidence Sustaining Conviction for Murder.** Evidence held sufficient to sustain a conviction for murder.

Appeal from District Court, Pittsburg County; R. W. Higgins, Judge.

J. J. Birdwell was convicted of murder, and he appeals. Affirmed.

W. H. Fuller, G. M. Porter, and J. L. Fuller, for plaintiff in error.

S. P. Freeling, Atty. Gen., and W. C. Hall, Asst. Atty. Gen., for the State.

DOYLE, P. J. This appeal is from a judgment rendered upon the verdict of a jury finding appellant, J. J. Birdwell, guilty of murder and assessing his punishment at imprisonment for life. The information charged Otto Collins, Ben Smith, and J. J. Birdwell with the murder of Price Jett. Upon arraignment appellant demanded and was granted a separate trial. Otto Collins and Ben Smith were jointly tried and convicted of murder. The jury fixed their punishment at imprisonment for life. Ben Smith appealed, and this case is a companion case to that of Ben Smith v. State, 19 Okla. Cr. 356, 200 Pac. 553, this day affirmed by this court.

The only ground seriously urged for a reversal is that the evidence was insufficient to sustain the conviction.

On Sunday morning, about half past 9, the 25th day of August, 1918, Price Jett and Lee Jett, his father, were shot and killed by Otto Collins and Ben Smith. The theory of the state was that this was a conspiracy between the defendants to allure the Jetts into an ambuscade and there kill them.

The crime, according to the state's evidence, was deliberately planned and brutally executed.

The record is very voluminous, but it is unnecessary to here review the evidence at length, because a sufficient statement of the same is set forth in the opinion in the Ben Smith Case.

It appears that the previous year Price Jett had caused the arrest of Otto Collins and Ben Smith on a charge of robbery; that shortly after Price Jett killed Jim Collins, a brother of Otto Collins; that on his trial the jury had failed to agree, and the case was still pending; that a day or two before the trial of Price Jett for killing Jim Collins, Lee Jett was shot in the leg from ambush, and claimed Otto Collins shot him. It appears that, as a result, it was a matter of current report that a feud existed between Otto Collins, Ben Smith, and the Jetts, father and son.

Summarized, the evidence shows: That appellant had lived in and around Blocker about 10 years, and at the time was employed at a coal mine two miles east and a half mile south of Blocker. Appellant had a conversation with Otto Collins in Blocker Saturday afternoon, later was seen to stop at the Bigg's home near Blocker, and Otto Collins and Ben Smith were sitting on the porch. About 6 o'clock that evening he was at the home of the Jetts, some four miles west of Blocker on the road to Crowder. A heifer belonging to Price Jett had strayed. Lee Jett and his wife had been to Crowder, and drove up to their gate, where appellant was sitting in his buggy. Ann Jett testified that she was standing inside of the fence; that appellant said to Lee Jett, if he had known where his heifer was yesterday when he spoke to him at Blocker, he would have told him, but he didn't know until today, when he saw a heifer with a bar L bar brand as he came out of his

coal bank, and he came right on here, and for Mr. Jett to come tomorrow and get the heifer; that Mr. Jett said that it was according to where it was, and appellant said:

"It was not towards his enemies, it was back the other way, and that he had never betrayed anybody and got them killed in his life."

That appellant repeated this statement two or three times. Mrs. Lee Jett told him that she would pay him $10 if he would bring the heifer there, and appellant said: "No, that he wouldn't unless Mr. Jett would go with him in the morning." That the next morning Price Jett, her husband, and Lee Jett, his father, went off on horseback to get the heifer.

Mrs. Ann Jett, widow of Lee Jett, testified, in substance, to the same conversation.

There was a series of Holiness meetings being held in a brush arbor about three miles southwest of Blocker, and within a mile of the home of Otto Collins. Two or three witnesses testified that appellant and Otto Collins attended the meeting that Saturday night. The air shaft at the mine where appellant worked burned out Thursday night; the miners were laid off; the men left in charge of the mine testified that they did not see appellant at the mine that Saturday. The following morning Price Jett and his father rode to Blocker, and from there proceeded with appellant towards the coal mine to get the heifer. They went a mile east, and turned south into a lane leading to the foot of a mountain; the wire gate there, in addition to the usual wire loops, had been fastened by several strands of barb wire tied around the posts. When they stopped at the gate Lee Jett got off his horse; then Otto Collins and Ben Smith commenced shooting from the brush. Appellant rode back. He stated to the first person he talked to and one or two others that the first shot came from the brush, and he made a similar statement before the coroner's jury.

Testifying in his own behalf, appellant said:

"Mr. Jett told me a month before that he had missed a heifer branded bar L bar. I was at the mine Saturday morning maybe an hour. My boy was with me. As we drove back along the road I saw the heifer, and told my boy that was Mr. Jett's heifer. About 4 o'clock I drove uptown to the pump by Brown's store. I saw Otto Collins, and he asked me how I would swap my mare and buggy for his horse and saddle, and I asked him what he would do. He said he could not trade, and I drove home, and then on to Mr. Jett's place to tell him about the heifer. When I arrived there I saw a little girl, and asked her where her papa was. She said he had gone to town. I looked down the road, and saw him coming. When he came up, I asked him if he had ever found his heifer. He said they hadn't. I told him I thought I saw her, and if he would come down I would show him the way, and if it was his heifer we would get her. He said he would be down the next morning. That is all that was said. His wife was sitting in the seat with him. If she said anything at all I do not remember it. I got home a little before sundown. I did not see Otto Collins that night, and I did not attend the Holiness meeting that night; me and my wife were there the night before. The next morning the Jetts, both horseback, came to my place, and asked me if I would go with them after the heifer. We rode straight on east to the lane where they were killed. We could see some cattle on the south end of the lane, and Mr. Jett said, 'Yonder is some cattle, we will go down and look at them; she may be with them.' We rode down to the other end, and Price Jett trotted up a little, and jumped off his horse to open the gate; I was five or six feet from Lee Jett. He said something, and jerked a gun out of his pocket and fired. Then the shooting commenced. I whirled my horse and left there, whipping my horse, when the mare made about three jumps, and I looked back, and saw Lee Jett fall off his horse, and I got a glimpse of some one on a horse south of the gate. When I reached the north gate I jumped down and opened it, passed out, and shut it to keep the loose horses from getting out. I told Mr. Bassett about the shooting, and rode on to Blocker, and there told a bunch of men about it. I didn't enter into any conspiracy with Otto Collins and Ben Smith be-

fore this killing, and I did not know that Otto Collins and Ben Smith were in that neighborhood at the time. The place where I saw the heifer was about a mile east of where the killings took place."

His cross-examination was in part as follows:

"Q. Why didn't you tell the coroner's jury the story you have told here? A. They didn't ask me.

"Q. What did they ask you? A. They asked me something or another about the shooting, how it happened.

"Q. Do you now admit to this jury that you didn't tell the coroner's jury that Lee Jett fired the first shot? A. I didn't tell that.

"Q. Didn't you tell them that the first shot came from the brush, and you didn't know who fired it? A. No, sir; I don't think so.

"Q. And you never did tell before you told it just now about seeing a man on horseback there? A. No, sir; I didn't.

"Q. You say that you never worked for Tom Goodman? You lived out there, didn't you? A. Stayed out there about two months, but never worked for him."

Thirty other witnesses testified on the part of appellant, but his codefendants did not testify.

At the close of the evidence counsel for appellant asked the court to advise the jury to acquit the defendant because the evidence was insufficient to warrant a conviction, which the court refused to do. This ruling is assigned as error.

Our Penal Code provides (section 2104, Rev. Laws):

"All persons concerned in the commission of crime, whether it be felony or misdemeanor and whether they directly commit the act constituting the offense, or aid and abet in its commission, though not present, are principals."

This statute abolishes the distinction between accessories before the fact and principals; by it all accessories before the

fact are made principals. If appellant aided or abetted the killing of Price Jett, he is as guilty as if he fired the fatal shots. Usually, as in this case, the proof of a conspiracy is merely incidental to proof of some other crime in which several have taken part. Thus, where a man has been killed as the result of a preconcerted assault upon him by several persons, it becomes necessary to prove a conspiracy to show the relations of the accused persons to one another.

As the existence of a conspiracy in any particular case is an inference to be drawn by the jury from all the facts and circumstances in evidence, the state may either prove the conspiracy which renders the acts of the conspirators admissible evidence, or it may prove the acts of the defendants, and thus prove conspiracy. If it is proved that two or more persons aided by their acts towards the accomplishment of the same unlawful object, each doing a part, so that their acts, though apparently independent, were in fact connected and co-operative, indicating a closeness of personal association and a concurrence of sentiment, a conspiracy may be inferred, though no actual meeting among them to concert means is proved. The details of a conspiracy need not be proved. Underhill, Cr. Ev. § 491.

This court has uniformly held that, when in a criminal case the inference of guilt can be reasonably drawn from the evidence, it will not interfere with the verdict on the ground of want of evidence to sustain it. There is a direct conflict in the testimony for the state and that for the defense. Upon the testimony of appellant and his witnesses the jury could have acquitted him. On the other hand, the testimony on the part of the state, if credited as it was, was amply sufficient to sustain the conviction. We think that from all the evidence in the case, carefully considered, it is evident that all the defendants were acting in concert with a common purpose and intent in the commission of the offense charged.

The instructions fairly submitted the law of the case to the jury, and no error was committed in refusing instructions requested.

Our conclusion is that there is no reversible error in the record. The judgment of the trial court is therefore affirmed.

MATSON and BESSEY, JJ., concur.