# JESS VAUGHN SAPP v. STATE.

No. A-10680.   Sept. 11, 1946.

(172 P. 2d 643.)

W. J. Hulsey, of McAlester, and Thad L. Klutts, of Oklahoma City, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., and Sam H. Lattimore, Asst. Atty. Gen., for defendant in error.

JONES, P. J.   Jess Vaughn Sapp was charged in the district court of Pittsburg county with the crime of rape in the first degree, was tried, convicted and sentenced to death and has appealed.

Two issues are presented in the brief of the defendant:   First, the defendant was denied a fair trial because of misconduct of the county attorney.   Second, the verdict was contrary to the law and the evidence.

Because this is a capital case in which the extreme penalty of the law is sought to be enforced, an extended summary of the evidence will be given.

The defendant was charged with the crime of rape committed by force on the person of one Dorothy Bradley, an eleven-year-old girl living at McAlester, Okla.   The defendant, at the time of the alleged assault, was an inmate of the Oklahoma State Penitentiary at McAlester, serving a ten-year sentence upon a plea of guilty entered by him to a charge of rape.   He was a trusty, with only three months remaining before the expiration of his sentence.   On the day in question, he had been directed to paint certain property used by the health department in the city of McAlester, about five blocks from the place where the alleged attack occurred.

Dr. Richard A. Harkins testified that on March 3, 1945, he was called by the night nurse of the Albert Pike Hospital to come to the hospital for the purpose of making a physical examination of Dorothy Bradley.   At the time of his examination, she was highly nervous.   There was a bloody discharge from her female organs;   the hymen was lacerated in three different places as if it had been penetrated.   A male discharge was found inside of the vagina.   The witness was of the definite opin-

ion that she had been penetrated by a male organ somewhere from two to four hours prior to his examination.

Dorothy Bradley testified that she was eleven years old and in the fifth grade at school; that on Saturday afternoon, March 3, 1945, she and her two-year-old niece, Barbara Peterson, went to a show on Choctaw avenue in the city of McAlester; that they left the theater about 4 o'clock p. m. and started home; that they stopped at the grocery store and bought some potato chips and at a hamburger stand and got some hamburgers, and then continued on their way home. That as they crossed the railroad switch track on Main street a man stepped up behind her and put his hand over her mouth and told her to walk on toward an empty tin building; that he continued to hold his hand over her mouth and pushed her toward the building. That he pushed her into the building and lifted the little two-year-old niece into the building also; that the man was dressed in white painter's overalls and had on a white cowboy hat; that he had a tool in his pocket which was used by painters or carpenters and had a knife in his hand. That when they got into the building the man threatened to kill her and also her little niece if she did not do exactly as he said. That he made her remove part of her clothes and lie down on the sand which was in the building; that after the man forced her to lie down on the sand, he unbuttoned his clothes, took out his privates and had sexual intercourse with her; that he hurt her very much. That all the time they were in there he was threatening to kill her and her two-year-old niece if she made an outcry or resisted; that they must have stayed in the building almost 30 minutes. That she was afraid of the man and was afraid he would kill her and the baby; that when she started to cry, he said, "I will kill you and her

too if you don't shut up." That when the man got off her she was bleeding and in pain; that after the man had finished he told her to put her clothes on, and after she had done this she started home. The man who committed the assault followed her for some distance. As soon as he left, she stopped at some friends' home and told them what occurred. That her mother worked at nighttime and her father in the daytime at the ammunition depot, and that neither of them was at home at that time, which was about 5 p. m. That when she arrived home, her sister was there and her father came in shortly; that she described the man who made the assault to the policemen, and her father and one of the officers took her to the hospital; that later that night the cops brought a man dressed in white overalls to her to see whether he was the man who attacked her, but she told them he was not. Subsequently they took her to the police station to see another man who was dressed in white overalls, but that he was not the man. That later the same evening they took her to the police station where she saw the defendant. At that time he was dressed in khaki clothes and had on a brown hat, but she identified him as the man who had raped her, but said he had changed clothes. On cross-examination the witness testified that when she first saw defendant she was positive of his face, but told the officers those were not the clothes he had worn at the assault and asked them to dress him in white so that she would be positive in her identification; that later she saw him again dressed in white overalls and she told the officers positively that defendant was the man who raped her. The blood-stained panties worn by the witness at the time of the assault were admitted into evidence without objection.

Ben Cooper testified that he was night chief of police at McAlester; that he was notified of the attack made on the little Bradley girl. That he went to her home and had her describe the man who made the assault; that he picked up Joe Lackey, who was dressed in white overalls, as a suspect, but that the little girl said he was not the man. That a fellow policeman arrested another man named Stephens shortly thereafter, who was dressed in white overalls, but Dorothy said he was not the man. That later that evening the defendant was brought to the police station. He had on khaki trousers, a white shirt and a black hat. When Dorothy Bradley saw him, she said, "That's him." That when Dorothy saw the defendant the first time she became nervous and excited; that later that evening they dressed defendant in white overalls and a white hat, and Dorothy Bradley said that he was the man who attacked her and that was the way he was dressed.

Mike Mayfield, policeman, testified to substantially the same facts as related by Ben Cooper.

Allen Dunlap testified that he worked at the penitentiary in charge of the trusty building; that on Saturday, March 3, 1945, the defendant, Jess Vaughn Sapp, checked out of the trusty building about 8 a. m. for the purpose of doing some painting and repair work on property belonging to the health department in the city of McAlester. That he checked back into the trusty building at 5:45 p. m.

Wiley Bradley, father of Dorothy Bradley, testified that he was working at the ammunition depot on March 3, 1945; that he arrived home between five and six o'clock; that Dorothy and his daughter, Mrs. Peterson, were there. That Dorothy related what had occurred and

he notified the officers. His testimony from that point was substantially the same as that related by the policemen Cooper and Mayfield. The witness testified that as quickly as Dorothy saw the defendant at the police station she said, "Daddy, that is the man."

Beatrice Peterson testified that she was the married sister of Dorothy Bradley, and that she was living with her parents at the time the attack was made on Dorothy. That Dorothy told her of the attack and told her how the man was dressed.

Molly Bradley, mother of Dorothy, testified that Dorothy was 11 years old at the time of the assault; that the witness left home about 4 p. m. to go to work and was not present at the time Dorothy came home after the assault.

H. C. McCloud, deputy warden of the State Penitentiary, testified that the chief of police called him the night of March 3, 1945, to inquire whether any painter from the penitentiary had been in the city of McAlester that day to work; that he was at the trusty building and found that the defendant had been in McAlester doing some painting. That he saw the defendant at the time, and he was dressed in a pair of khaki trousers, bare headed and in a little undershirt. That he took the defendant to town to the police station where Dorothy Bradley identified him as the man who had attacked her. That later that evening they dressed him in white painter's overalls and white hat and took him back again.

Clint Gladden, deputy sheriff, testified to substantially the same facts as related by the policemen. In addition, he testified that at the time the defendant appeared at the police station with the white painter's

overalls and the white hat, the clothes were removed from him and turned over to the witness. He identified the various articles of clothing, and they were admitted in evidence. He testified that the underwear was in the same condition it was in at the time he removed it from the defendant, and that the blood stains which were then showing were on there at the time he removed the underwear from the defendant. The articles of clothing, including the underwear, were admitted in evidence without any objections on part of defendant. The witness further testified that the hat and jacket worn by the defendant at the time he was first brought to the police station were borrowed by defendant from an inmate named Neil, no. 29,112; that he took the clothes of defendant with the blood stains on them to the State Health Department for a test.

Roy Anders, chief of police, substantiated the testimony of the other officials. He further testified that after Dorothy Bradley had identified the defendant at the police station the first time, he took him back to the penitentiary and had him put on the white painter's overalls; that he examined his underwear which he was wearing, and they were bloody; that he also examined his person and found blood on his privates.

L. C. Weed testified that he was a guard at the penitentiary on March 3, 1945, but had since been discharged. That he was in the city of McAlester on Saturday afternoon, March 3, 1945, and saw the defendant on South Main street. The defendant was dressed in a white suit of painter's overalls. That he saw him in a beer joint sitting in a booth with a girl about 1 p. m.; that he drank a bottle of beer with him at the time. That he saw the defendant again about 20 minutes until 4 o'clock on the

sidewalk near Cox's place; that the defendant asked him, "What time is it," and he told him it was 20 minutes until 4 o'clock. That he did not see the defendant again until about 11 p. m. when the officers brought him to his cell block and told him to put him up on "Sol." He testified that before putting him in the cell, his clothing was removed; that the defendant's person was bloody, and the defendant said that he had had a date with another woman that evening, and defendant said, "I sure am messed up." That defendant did not have his underwear on at that time. On cross-examination the witness testified that the last time he saw defendant Saturday afternoon, he was with an Indian girl about 19 or 20 years old; that defendant had been drinking, but he did not consider him as drunk. That he saw defendant at various times Saturday afternoon, between 1 and 4 o'clock.

Mrs. Harry Myers testified that she was the wife of the sanitarian for the Health Department. That the defendant was supposed to have worked at the health department on March 3rd; that her husband had left word he would take defendant back to the penitentiary at 4 o'clock. That defendant came to her house at 5:15, and said he was ready for her husband to take him back to the trusty building, but she told defendant her husband was not there, and defendant left. That she lived about six blocks from Comanche and Main street where the attack is alleged to have occurred. That she knew defendant because he had performed work at various times for the Health Department where her husband worked; that defendant did not act or look peculiar or unusual when he came by her house, nor did he appear to be intoxicated. (It was later brought out that it was

only five blocks from her home to where the crime occurred.)

This was the close of the state's testimony.

On behalf of the defendant the following evidence was introduced:

Mrs. Lee Forrester testified that her husband worked at the State Penitentiary, and that she lived in one of the brick houses near the penitentiary; that she had seen defendant working in her house and knew him. That she saw him returning to the penitentiary about 5:30 p. m. on March 3, 1945, and did not notice anything unusual about him; that the defendant came by their house and stopped for a few minutes, so that she had a good opportunity to observe him.

The defendant testified in his own behalf that he was 44 years of age. That he had been sent to the penitentiary five times for various crimes committed by him since 1925. That he pleaded guilty to the crime of larceny from the person in 1925; that in 1927 he pleaded guilty and was given ten years for the crime of robbery; that in 1932, and again in 1936, he pleaded guilty to the crime of larceny of an automobile. That in 1940 he pleaded guilty and was given ten years for the crime of rape in the second degree. That at the time of the alleged attack on Dorothy Bradley he had been a trusty for four years and only lacked about three months having his sentence served. That on Saturday, March 3, 1945, he went into the city of McAlester and painted on one of the buildings in the Health Department; that he had been painting there for about six weeks; that he quit work shortly before noon. That he saw the witness Weed at a little eat shop, and they drank a beer together

about one p. m. That about 1:30 he went to another beer joint owned by a fellow called Edgar with Mr. Weed; that he stayed around Edgar's bar with Weed until about 20 minutes till 4 o'clock. That he then walked up the street with a girl by the name of Maudie Bell Davis to get something to eat; that he went into a cafe and sat there talking with this girl until about five minutes after four. That he then went up to Stapp's beer joint and bought some cigaretts and more beer; that about 4:15 he went back to Edgar's bar; that he stayed in there drinking some beer and sitting with some girls until about five minutes to 5 o'clock, at which time he went over to Myers to get Mr. Myers to drive him back to the trusty building. That when he learned Mr. Myers was not at home, he took a cab and rode to the penitentiary; that he arrived at the penitentiary about 5:30 p. m. That he stopped at Forresters a few minutes without checking in at the trusty building. That after checking in at the trusty building he changed clothes and took a bath; that he had been wearing white painter's overalls, but that he removed them and changed into khaki clothes when he took a bath. That he was arrested about 8 p. m. and brought down to the police station. Defendant further stated that when he took a bath he did not change underwear, but that the underwear he had on at the time of his arrest was the same underwear he had worn during the day. He further denied that there was blood on his underwear, but granted that there were stains from his work. On cross-examination the defendant said he did not know what it was on his underwear. He denied that he told the officers that it was blood, or that he had ever made a statement to the county attorney. He said that at the time of his arrest he had on a jacket and a black hat that he had borrowed from No. 29112. He

further admitted on cross-examination that at the time he worked in the city of McAlester he had on the white overalls and the white hat in which he was dressed the second time he was brought before Dorothy Bradley for identification.

In rebuttal, the officers who had previously testified were recalled and testified that they had a conversation with defendant after his arrest, in which the defendant admitted that the stains on his clothing were blood, but an objection was sustained to questions asked as to what explanation the defendant made as to why the blood stains were on his clothing.

There is little merit to either of the propositions presented in defendant's brief. The first contention that defendant was denied a fair trial due to certain conduct on the part of the county attorney pertains to statements which occurred during the voir dire examination of the jury. Most of the examination of the jurors is reported in the record and is quite lengthy. The record discloses that counsel for both the state and the defendant had examined many jurors, and some had been excused upon challenges for cause. After one of the jurors had been excused and another called for voir dire examination, the record discloses the following occurrence:

"Mr. Hulsey: I wanted to make this observation— I wanted to take one up at a time to avoid that—but the county attorney insists on going into it again, and that leaves a loop-hole— Mr. Haile: The defendant hasn't failed to go into any loop-hole they have found either. Mr. Klutz: We object to that and ask the court to admonish the county attorney to refrain from that sort of conduct—Mr. Haile: You ask the court to admonish the county attorney, but don't you go to doing it yourself. Mr. Klutz: We ask the court to admonish the county

attorney to refrain from that sort of conduct in the presence of the jury. Mr. Haile: Well, don't you go to admonishing the county attorney yourself. Court: Be seated, both of you. Mr. Klutz: We ask the court to admonish the county attorney— Court: The court declines to admonish—save your exception. Mr. Klutz: We except to the ruling of the court."

The first assignment of error is directed solely to the alleged misconduct of the county attorney consisting of the remarks made by the county attorney and directed toward counsel for defense. It would have been much better if the county attorney had omitted the remarks which were made. We do not know from the record just what provocation the county attorney had to induce him to make such statements. We find too much bantering and bickering between opposing counsel in many of the cases which are brought before this court for review. Here the trial court did not allow the proceedings to get out of control, and there is nothing in the record to suggest that the remarks which were made by the county attorney had any effect upon the trial and conviction of the defendant. There is certainly nothing said that is prejudicial to the defendant. The fact that it is improper for opposing counsel to interrupt the orderly procedure of the trial by making side remarks at each other does not necessarily mean that such improper remarks may be used as a basis for a mistrial. Counsel apparently did not attach any particular significance to the matter as it was not mentioned in the motion for new trial. We can find no prejudicial error by reason of this occurrence.

The second assignment of error, that the evidence is insufficient to sustain the conviction, cannot be sustained. We have heretofore given a lengthy summary

of the evidence introduced by both the state and defendant. The corpus delecti was proved. The testimony of the little girl, corroborated by the evidence of the examining physician, is sufficient to show that the crime of rape was committed. The positive identification of the defendant by Dorothy Bradley, corroborated by the physical circumstances that the defendant was in the vicinity where the act was committed during all of the afternoon preceding the alleged attack; that he was dressed in white painter's overalls; that when arrested a short time after the alleged attack occurred, he had changed his outer clothes but still wore his undergarments which were stained with fresh blood, and that also he had blood on his private organs, are sufficient facts and circumstances to conclusively show defendant's guilt.

His alibi depended solely upon his own testimony and was weak. By his own evidence he placed himself in the vicinity where the crime was committed. He had been drinking intoxicants during all of that afternoon. He admitted that the underwear offered in evidence by the state was worn by him at the time of his arrest. He denied that the stains on the underwear were blood stains, but would give no explanation as to when or where the stains got on his underwear, but suggested they might have gotten on there from some of the work he had been doing.

The most that can be said in defendant's favor is that his testimony raised an issue of fact for the determination of the jury. Before this court would overturn the verdict of the jury, we are required to find that there is no substantial evidence in the record upon which the

jury could base their verdict. As above shown, there is ample competent evidence to sustain the finding of guilt.

In the recent case of Todd v. State, 82 Okla. Cr. 424, 172 P.2d 345, in a prosecution for the crime of rape, it is stated:

"Case will not be reversed for insufficiency of evidence where testimony of the state is sufficient, if credited by jury, to show defendant's guilt."

See, also, Parks v. State, 18 Okla. Cr. 277, 194 P. 281; Birdwell v. State, 22 Okla. Cr. 184, 210 P. 558; Mills v. State. 73 Okla. Cr. 98, 118 P.2d 259; Morgan v. State, 72 Okla. Cr. 377, 116 P.2d 742; Harvey v. State, 73 Okla. Cr. 132, 118 P.2d 669.

One cannot read this record without becoming impressed with the certainty of the defendant's guilt of this crime.

Although not mentioned in defendant's brief, the question that has caused this court the deepest concern is whether under the law and the facts of this case the crime is such as justifies the imposition of the supreme penalty of death.

One can hardly realize that a prison system can become so lax that a person with the long prison record of the accused would be given the liberties which were accorded to the defendant. It is well to note that the record discloses that the guard who imbibed freely of intoxicants with defendant on the afternoon of the assault was quickly discharged. This outrageous crime has had the effect of focusing the attention of the Legislature of this state upon our prison conditions, and apparently a complete revision of the entire system of trustyship is being

effected. (Report of Special House Investigating Committee with Recommendations for Reformation of Trusty System, 1945 House Journal 1443.) The system under which an habitual criminal would be at liberty to roam the streets at will without supervision or control is at least partly responsible for the perpetration of this terrible crime. It could probably be truthfully said that this crime was the inevitable result of a penal system that has developed through the years of permitting hardened criminals to be at liberty under the guise of a trusty-ship, free to roam the streets, drink intoxicants, and consort freely with prostitutes and street walkers.

This entire record has had the careful study and consideration of all three members of this court. As has been heretofore stated:

"No more solemn duty can be imposed upon the courts than the duty of protecting, and the duty of taking, human life. To take the life of a human being is an awful thing, even when it is taken by the law." Moore v. State, 75 Okla. Cr. 222, 130 P.2d 114, 120.

The supreme penalty of death in the electric chair should not be imposed in this state except in the most aggravated cases, and then only when the law and evidence justify it.

If it had not been for the long prison record of defendant, this court would never have hesitated under the requirements of justice to have modified the sentence which was imposed. . However, in spite of the fact that the record shows him to be an habitual criminal, many law-abiding citizens for whom the defendant had worked as a trusty testified in his behalf that during the years

they had observed him as a trusty that he was quiet, mannerly and a hard worker.

So far as the crime is concerned, we find no extenuating circumstances in defendant's favor. He is a confirmed criminal and most certainly should never again be allowed outside the penitentiary to loosen his passion and lust upon innocent people. However, even though the defendant is an habitual criminal, his life should not be taken for this offense unless this court can say that his acts were of such an aggravated nature that the law demands that he be put to death as punishment for his misdeed. The defendant completed an act of sexual intercourse with an eleven-year-old girl. She suffered no physical violence other than that resulting from the act itself. The young girl was not confined to her bed by reason of the attack. In fact, she was able to walk home unassisted. She stopped at a neighbor's house and told two of her young girl friends of the crime. She stayed at the neighbor's house for about 15 minutes and then walked on home and related to her sister what had occurred. Apparently there will be no permanent physical disability as a result of the experience which she had.

This court has recently sustained the imposition of the death penalty in a rape case, Norman v. State, 81 Okla. Cr. 78, 160 P. 2d 739. However, this case differs from Norman v. State, supra, in that in the latter case the defendant inflicted permanent physical injuries to the prosecutrix by hammering her over the head with a gun until her skull was fractured, by shooting her in the mouth which knocked out some of her teeth and split her tongue, and thereafter cutting her throat with a knife and dragging her into a ditch of water to drown. That

the prosecutrix lived to prosecute Norman was miraculous. Here the act was accomplished by means of threats. The prosecutrix was not choked, struck, or harmed in any way other than the harm that befell her as a result of the sexual act. Her outward appearance immediately after the act was unchanged from that before the act, although the doctor testified that at the time of his examination she was very nervous. Prior to his examination she had driven over the streets of McAlester with her father and a policeman in an endeavor to apprehend the perpetrator of the crime.

It is our conclusion that the facts surrounding this crime do not justify the assessing of the extreme penalty of the law, and the judgment and sentence of death should be modified to provide that defendant, Jess Vaughn Sapp, be imprisoned in the State Penitentiary for life at hard labor. Surely this defendant, with a record of six convictions in felony cases, will never be allowed outside the prison walls again, but that in reality he should be forced to spend the remainder of his days confined to the penitentiary at hard labor, and, if this is done, such punishment will be ample for the crime which was committed.

It is therefore ordered that the judgment and sentence of the district court of Pittsburg county be modified by reducing the sentence imposed upon the defendant from that of death by electrocution to life imprisonment in the State Penitentiary at hard labor, and the judgment and sentence of Pittsburg county as thus modified is affirmed.

BAREFOOT and DOYLE, JJ., concur.